UNITED STATES DISTRICT COURT
FOR THE STATE OF RHODE ISLAND

| | |
|---|---|
| H&H INTERNET, N.V., a Netherlands corporation,<br><br>v.<br><br>P.S.W., INC., a Rhode Island corporation, d/b/a PSW BILLING; and JOHN LOMBARDI, individually, | Case No.: 04-324-L<br><br>**AFFIDAVIT OF JOHN LOMBARDI** |

I, John Lombardi, do hereby declare:

1. I am a defendant in the current action. I make this declaration of my own personal knowledge, and could and would testify as to the matters contained herein under oath.

2. Because the timeline is so important in this case, I will lay out my declaration in roughly chronological order. PSW, Inc. was formed in 1999 by multiple parties, including myself. Since that time, PSW has been a properly maintained and operated corporation, with carefully maintained books and records, annual meetings, proper corporate filings, and bank accounts maintained separate from those of its stockholders. I am currently the sole stockholder, director and officer of PSW, Inc. At no time have I ever taken any action alleged in the First Amended Complaint ("FAC") in any capacity other than in my capacity as an officer of PSW.

3. PSW is a third-party credit card processor that enters into contractual relationships with various entities and banks that have relationships with Visa and Mastercard. As a result of these contracts, PSW is able to facilitate credit card transactions for other companies, such as H&H. PSW does not maintain, and has never maintained, segregated bank

accounts for its customers. All of PSW's cashflow is commingled before allocation. Any account numbers assigned to its clients are for internal allocation purposes only.

4. On November 9, 2001, H&H entered into a written and signed agreement with PSW, so that PSW would process H&H's credit card transactions for a fixed fee. A true and correct copy of key excerpts from the Agreement are attached hereto as **Exhibit A**. For the Court's convenience, I have also included a more legible version of the form contract H&H signed. I am not a party to this Agreement and have never agreed to be personally bound by its terms. Further, I have never entered into an oral agreement with H&H in my personal capacity.

5. On or about August 2002, I was interviewed for an article that was published in AVNOnline.com on or about September 1, 2002, long before this dispute arose. This article is referenced in paragraph 14(d) of the FAC. A true and correct copy is attached hereto as **Exhibit P**.

6. On December 5, 2002, H&H entered into a signed appendix with PSW, naming Stuart Horner as its domestic contact.

7. Pursuant to the Agreement, PSW processed H&H's Mastercard transactions through its contractual relationship with First Data Merchant Services Corporation and subsidiary Shared Global Systems, Inc. (collectively, "First Data"). Furthermore, PSW processed H&H's Visa transactions thru its contractual relationship with ECB-E-Commerce Billing and Processing Ltd., a company related to Leumi Card, Ltd. and Bank Leumi LE-Israel Ltd. (collectively, "ECB"). On or about July 28, 2003, ECB ceased processing transactions for

all of its customers, including PSW. This date is very well known in H&H's industry and not seriously contestable.

8. Within 48 hours, I personally notified H&H of this development, and asked their consent to shift processing of their upcoming Visa transactions to JP Media Ltd. dba eSHAX.com, which had a contractual relationship with Deutsche Bank. H&H agreed. We never had any connection with Deutsche Bank.

9. On or about August 1, 2003, I authorized the sending of a notice to our clients to explain to them the then current situation. As I had quickly made arrangements in reaction to the news about ECB, in my opinion at the time, PSW would be able to continue processing indefinitely. PSW had sufficient funds on hand to operate its business during the transition period. I was also confident that PSW would be able to recover funds from ECB through the court system. A true and correct copy of the text of this notice referenced in paragraph 14(a) of the FAC is attached as **Exhibit B**.

10. Contrary to official company policy, on or about August 3, 2003, Matthew Gardner, a low-level employee without any authority to communicate on behalf of PSW, posted on the "GFY bulletin board," a website popular with owners of adult websites. A true and correct copy of that posting referenced in paragraph 14(e) of the FAC is attached hereto as **Exhibit C**. As is evident from the text of the post, Matthew clearly identifies himself. At no point does he state or imply that company management would cover PSW's debts. Moreover, on or about August 6, 2003, Gardner posted again on the GFY bulletin board, clarifying that nothing in his prior post stated that PSW management would cover PSW debts. A true and correct copy

of this post on the website is attached hereto as **Exhibit D**. H&H did not take any actions with regard to their accounts during this short timeframe.

11. On August 6, 2003, I authorized an official company statement to truthfully inform all of our clients that delays in payouts being experienced by some of our clients were due to issues with a bank, *i.e.*, ECB. A true and correct copy of the text of this email referenced in paragraph 14(b) of the FAC is attached hereto as **Exhibit E**. Nothing therein makes any reference to H&H, because it was a "global" notice. Furthermore, as a result of discussions between my attorney and ECB's attorneys, I believed at the time that some money was being released by ECB. Furthermore, at this point, I wrongfully believed that ECB was holding money owed to H&H.

12. On August 8, 2003, Gardner informed the GFY community that "in the current climate we would recommend that **anyone** spread out their assets," putting all clients on notice that their money was not secure, and that they should diversify. On August 26, 2003, Gardner (identified as "M") again posted on the GFY bulletin board. A true and correct copy of excerpts from this bulletin board "thread" referenced in paragraph 14(f) of the FAC is attached hereto as **Exhibit F**. Only at this point did I learn that he was purporting to communicate on behalf of the company and demanded that he cease doing so.

13. I was interviewed by AVNOnline.com about the letters I had sent to Visa and Mastercard threatening to sue them. This interview, published by AVNOnline.com on September 8, 2003, is referenced (and mis-attributed) in paragraph 14(c)(1) of the FAC. A true and correct copy is attached hereto as **Exhibit G**. Everything contained therein is true.

14. Without any justification, First Data ceased all processing activities for PSW on September 26, 2003, holding $1,600,000 of PSW's money (including **$1,998.33** of H&H's money). H&H consented to have eSHAX.com henceforth process all of its transactions, and according to their First Amended Complaint, continued to let PSW process their transactions. While it is not a basis for this summary judgment motion, H&H was made aware of the risks of processing through eSHAX.com.

15. On or about September 29, 2003, PSW began communicating with legal counsel about filing a lawsuit against First Data.

16. On September 30, 2003, PSW sued ECB in the Southern District of Florida to recover monies pertaining to ECB's processing of PSW accounts. Confidential settlement discussions commenced almost immediately and by November 26, 2003, ECB had offered to release at least a portion of the funds.

17. I was again interviewed by AVNOnline.com about the dispute with Visa and Mastercard. This interview, published by AVNOnline.com on November 12, 2003, is referenced (and mis-attributed) in paragraph 14(c)(2) of the FAC. A true and correct copy is attached hereto as **Exhibit H**. Everything contained therein is true.

18. On or about November 13 and 16, 2003, I communicated by email with H&H's financial manager Marc LePoutre. True and correct copies of these emails referenced in paragraphs 19(a)-(b) of the FAC are attached hereto as **Exhibit I**. Nothing stated therein was false or intended by me to cause any reliance. At this time, I still believed that some of the money held by ECB belonged to H&H. Regardless, the November 16 email makes it clear that I

was fighting 3 banks simultaneously, and in fact, my attorneys were talking to First Data at the same time. Thus, I made no statement that ECB/Leumi held their money, as opposed to First Data. All I wanted was for H&H to be patient and let my attorneys do their job.

19. eSHAX.com continued to process PSW's accounts until November 26, 2003, when Deutche Bank closed eSHAX.com's account, keeping all of eSHAX.com's money (including $210,000 of PSW's, and thus **$84,523.83** of H&H's money). At this point, PSW ceased all processing activities.

20. On or about November 26, 2003, I authorized another press release to all of our clients, whether or not it applied to them. A true and correct copy of the text of this release referenced in paragraphs 15 and 18(a)-(e) is attached hereto as **Exhibit J**. The statements made therein are true. PSW continues to agree to abide by the terms of its written agreements and to release funds as received from the respective banks. PSW did not provide any timeline because it has no control over the court process.

21 On or about December 9, 2003, I spoke with LePoutre over the phone. I told him that settlement money was expected and that any of H&H's money recovered would be forwarded to H&H. Though I would not have specified that source of the expected money, at this time, I still believed that some of the money held by ECB belonged to H&H. It was only in or around late January 2004 that PSW's accountant explained to me that all of H&H's Visa transactions pertaining to ECB had already been paid.

22. On or about December 15, 2003, PSW's lawsuit against ECB was settled via confidential settlement agreement. As H&H's money from ECB had already been paid, and

H&H was solely owed money from First Data's processing of Mastercard transactions, and eSHAX.com's processing of Mastercard and Visa transactions, H&H was not entitled to any of this money.

23. Starting in October, 2003, PSW's attorneys attempted, but failed, to recover funds from First Data. PSW eventually decided to not only sue First Data, but also the oligopolists Visa U.S.A., Inc. and Mastercard International, Inc., the practices of which few have dared to challenge. On August 16, 2004, PSW filed a complex antitrust action against First Data, Visa U.S.A., Inc. Mastercard International, Inc. and First Financial Bank in this Court, Case No. 04-347-T. It is not likely that money will be recovered before this matter is resolved. Though this case is still pending, in the proceedings, First Data has admitted in open court to withholding $1.6 million of PSW's money (including money owed to H&H), claiming that Mastercard had fined them $1,000,000 as a result of PSW's clients' chargeback ratios. H&H was a client whose accounts were in excess of Mastercard's chargeback threshold. As H&H's money is largely possessed by eSHAX.com, it is impossible for PSW to be funding this action with H&H's funds.

24. Based on my educated understanding of eSHAX.com's financial situation, it is my good faith business judgment that it is not financially worthwhile for PSW to file suit against eSHAX.com. Moreover, as PSW is not in privity with Deutsche Bank, which actually possesses the money, PSW does not believe that it can pursue a direct claim against them. This is very different from PSW's contract claims against ECB and First Data. Notwithstanding the fact that the overwhelming majority of H&H's money is effectively unobtainable from Deutsche Bank,

PSW has generously offered on numerous occasions to pay H&H the entirety of its account when the First Data case is resolved.

25. On January 8, 2004, I received a letter from Janet Conway, the merchant processing and recovery agent hired by H&H to collect monies from PSW. A true and correct copy of this letter is attached hereto as **Exhibit K**. At this point, H&H had clearly placed us in an adversarial position. Not only did I make this clear in an email sent on January 10, 2004, but I made further communications go thru my attorney, who tried to resolve the issue pursuant to settlement discussion, in which we again offered to pay 100% of the money owed when received from First Data, even though some of this money was held by eSHAX.com's bank. A true and correct copy of the email referenced in paragraph 19(d) of the FAC is attached hereto as **Exhibit L**. I had incorrectly informed my attorney at the time that ECB had been retaining money pertaining to H&H.

26. As of today's date, H&H is owed $85,522.16, to be paid if and when the money is recovered from First Data and eSHAX.com. As shown by the fact that I continued to wrongfully believe that ECB had possessed H&H's money in January 2004, I absolutely did not intend to deceive H&H. Rather, I am confident that my conduct from the beginning of the relationship until this very day demonstrates a man trying to help his friends continue their business and be paid in full.

27. Attached as **Exhibit M** is a true and correct copy of H&H's Responses to Interrogatories Propounded by Lombardi.

28. Attached as **Exhibit N** is a true and correct copy of H&H's Responses to Interrogatories Propounded by PSW.

29. True and correct copy of three spreadsheets accurately setting forth H&H Internet's processing and payout history with PSW, Inc. are attached hereto as **Exhibit O**.

I declare that the foregoing is true and correct pursuant to the laws of the State of Rhode Island and the United States.

Executed on January 30, 2006 at Providence, Rhode Island.

John Lombardi

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

Subscribed and sworn to before me this 30th day of January, 2006.

Notary Public: Linda M. Marzello
My commission expires: 7/20/08

MSJ