**UNITED STATES DISTRICT COURT**
**FOR THE STATE OF RHODE ISLAND**

H&H INTERNET, N.V., a Netherlands corporation,

v.

P.S.W., INC., a Rhode Island corporation, d/b/a PSW BILLING; and JOHN LOMBARDI, individually,

Case No.: 04-324-L

HEARING REQUESTED ON ALL ISSUES ON MOTION FOR SUMMARY JUDGMENT

## H&H RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff H&H Internet submits its Response to Defendants' Statement of Undisputed Facts:

| | Proposed Undisputed Fact | Response and Evidentiary Support |
|---|---|---|
| 1 | PSW, Inc. is a properly formed and maintained Rhode Island corporation. | Disputed, See Lee Affidavit, Para. 2, 3; Exhibit 6 |
| 2 | John Lombardi is the sole stockholder, director and officer of PSW, Inc., and was so during all times at issue in this action. | admit. |

| | | |
|---|---|---|
| 3 | Any actions alleged in the First Amended Complaint were taken by Lombardi in his capacity as an officer of PSW. | Denied. See, Plaintiff's A/I # 8, 14, 15 (Exhibit 13). J. Conway Aff. at par. 15, referencing Amended Complaint, (Exhibit 11) par. 20-24. Lombardi's communications to plaintiff, attached to Lombardi's own affidavit, consistently uses the first person "I", and makes personal assurances because of his professed "friendship" with plaintiff. LePoutre affidavit, par. 9. On information and belief, settlement funds from the ECB settlement went to Lombardi personally, by way of attorney Steiner's trust account. Further proof must await the depositions of Lombardi and Steiner, as well as of accountant Perreault, all of which have been noticed before the discovery deadline in two weeks, and plaintiff requests the right to contest defendant's affidavits in accordance with FRCP 56 (e) and (f), and that this court's decision await the completion of the depositions (including records of the trust account previously requested). |
| 4 | PSW does not maintain, and has never maintained, segregated bank accounts for its customers. All of PSW's cash flow is commingled before allocation. The account numbers assigned to H&H are for internal allocation purposes only. | Denied. See, Plaintiff's A/I #9, 21, 22 (Exhibit 12). LePoutre affidavit, par. 3 |
| 5 | H&H signed a written processing agreement with PSW, Inc. on November 9, 2001 (the "Agreement"), which is integrated and may only be modified in a signed writing. | H&H did sign such agreement, but no copy produced by PSW has a PSW signature, though it appears that some initials may be those of Lombardi. See, Lee Aff. par. 4 |
| 6 | Lombardi is not a party to the written Agreement. | Admit. |

| | | |
|---|---|---|
| 7 | Nothing in the Agreement requires PSW to maintain segregated bank accounts for its customers. | Admit, but see Lee Aff. par. 4. |
| 8 | Nothing in the Agreement's terms requires PSW to sue Credit Card Service Companies. | Admit, but see LePoutre Aff. at 7-9; J. Conway Aff. par.3-5, 7-8; Lee Aff. par. 8, 9; regarding assurances to sue and recover for H&H, representations that were – at the time they were made – not true about Lombardi's/PSW's present intentions. See, Grassi v Gomberg, 81 R.I. 302, 305, 102 A.2d 523 (RI 1954) (the question is whether "at the time they made such representation it was not their intention" to act as represented). These representations by Lombardi personally were reasonably relied upon to plaintiff's detriment, and induced plaintiff's continued business with defendants. |
| 9 | Nothing in the Agreement's terms requires PSW to inform H&H of the status of its litigation efforts to recover withheld funds from Credit Card Service Companies. | See, #8 above. |
| 10 | Pursuant to the Agreement, PSW is only obligated to pay H&H when money is received from the Credit Card Service Company that processed H&H's transaction. | Denied, See Lee Aff. par. 6,7. |
| 11 | At the outset of the relationship, H&H's Visa transactions were processed by PSW through ECB. | Admit. |
| 12 | At the outset of the relationship, H&H's Mastercard transactions were processed by PSW through First Data Merchant Services Corporation. | Admit. |
| 13 | ECB ceased processing transactions on July 28, 2003. | Admit. |

| | | |
|---|---|---|
| 14 | After being contact by Lombardi prior to August 1, 2003, H&H immediately agreed to transfer its Visa processing to eSHAX.com and Deutche Bank. | Denied, See, LePoutre Aff. par. 6, 7 |
| 15 | The August 1, 2003 Notice to all clients was true, and concerned opinion and future events, not present facts. | Denied. See, Conway Aff par. 2ff. See, response #8 above. Under Grassi, it will be for the jury to determine if, at the time Lombardi made those statements, whether he truly did intend to act as promised or whether the promises were made without any intention to follow through, and rather to wrongly and deceitfully induce plaintiff to continue business with defendant. |
| 16 | The August 3, 6 and 26, 2003 postings cannot be attributed to PSW or Lombardi. They were made by low-level employee Matthew Gardner without authorization and contrary to company policy. In any case, the August 6 posting clarified any confusion about the August 3 posting. After the August 26, 2003 posting, Lombardi learned of Gardner's actions and put a stop to them. | Denied, See LePoutre Aff. par. 8, Lee Aff at 7-9. Gardner's authority as "Executive Vice President" will be a question of fact, especially given no documentary proof of any "censure" nor public (or to plaintiff) correction of his authority to make such representations (which defendant no doubt considers misrepresentations given their "lack of authority" defense). |
| 17 | The August 3 and 6, 2003 postings concern future events. | Denied, See Lee Aff. par. 9, J Conway Aff at 6, Lee Aff. par. 9, LePoutre Aff. at 7-8; and arguments at #8 and #15, above. |
| 18 | H&H did not take any actions in reliance on the August postings. | Denied, LePoutre Aff. at 7-9. |
| 19 | The August 6, 2003 Notice to all clients was accurate to the best of PSW's then knowledge, and concerned future events, not present facts. | Denied, See J. Conway Aff. par. 6, See #17 above. |
| 20 | At the time of the August 6, 2003 Notice, Lombardi believed that ECB had been holding some of H&H's money. | Admit. |

| | | |
|---|---|---|
| 21 | The September 9, 2003 and November 12, 2003 independently-published articles are not false, nor contain representations made to H&H. | Denied, See LePoutre Aff. par 7-9 |
| 22 | The September 9, 2003 and November 12, 2003 independently-published articles concern future events, not present facts. | Denied, LePoutre Aff par. 7; See argument at #8 and #15 above. |
| 23 | The September 9, 2003 and November 12 independently-published articles put H&H on notice of a dispute between PSW and Visa and Mastercard. | Admit. |
| 24 | First Data ceased processing for PSW on September 26, 2003. | Admit. |
| 25 | After First Data ceased processing for PSW, H&H agreed to have all of its processing through PSW done by eSHAX.com | Admit. |
| 26 | PSW began immediately contacting legal counsel about pursuing claims against First Data. | Unknown. Inquiry will according be made at the noticed depositions concerning Lombardi's contact with counsel, and regarding what personal or corporate issues. |
| 27 | PSW sued ECB on September 30, 2003. Settlement discussions began almost immediately and the case settled on or about December 15, 2003. | Unknown. |
| 28 | The November 13 and 16, 2003 emails to LePoutre are not false. | Denied, See LePoutre Aff. par. 7; See, #8 and #15 above. |
| 29 | The November 13 and 16, 2003 emails to LePoutre concern future events, not present facts. | Denied, See LePoutre Aff. par. 7; See, #8 and #15 above. |
| 30 | At the time of the November 13 and 16, 2003 emails, Lombardi believed that ECB had been holding some of H&H's money. | Admit. |

| | | |
|---|---|---|
| 31 | eSHAX.com ceased processing on November 27, 2003, when Deutche Bank withheld all monies. | Disputed to the extent of J. Conway Aff par. 8. |
| 32 | PSW ceased processing for H&H and all clients on November 27, 2003. | Admit. |
| 33 | The November 27, 2003 Notice is true,. | Denied, See, J. Conway Aff. at 7-8 |
| 34 | The November 27, 2003 Notice concerns future events, not present facts. | Denied, See, J. Conway Aff. at 7-9; See #8 and #15 above. |
| 35 | The December 9, 2003 telephone call concerns future events, not present facts. | Denied, See LePoutre Aff par 3-5. See, #8 an #15, above. |
| 36 | At the time of the December 9, call, Lombardi believed that ECB had been holding some of H&H's money. | Admit. |
| 37 | H&H was not owed any money pertaining to ECB-processed transactions when the PSW/ECB settlement was reached on or about December 15, 2003. | Denied, M. Conway Aff. par. 3-9. See, J. Conway Aff. par 15, and Ex. 11, par 20-24. |
| 38 | H&H retained a collections expert as of January 8, 2004. | Admit. |
| 39 | From January 8, 2004, onward, the parties were in an adversarial posture, making any claim of reliance on subsequent statements implausible. | Denied. LePoutre Aff. par 10. |
| 40 | It was not until in or around late January 2004 that Lombardi first learned that ECB had not, in fact, been withholding funds pertaining to H&H. | Denied, M. Conway Aff. par. 3-9. Lombardi's bald assertions are questions of fact to be believed, or otherwise, by the jury. |
| 41 | After nine months of discussions between PSW's counsel and First Data, the case against First Data was filed on August 16, 2004. | Unknown, question of fact, but subject to pending depositions. See also, J. Conway Aff. par. 7. |

| | | |
|---|---|---|
| 42 | $1,998.33 of H&H's money is still being withheld by First Data. It has not been received by PSW. | Denied, M. Conway Aff. par. 3-9. |
| 43 | $84,523.83 of H&H's money is still being withheld by Deutche Bank, with whom PSW is not in privity. eSHAX.com is known to have little if any assets. It has not been received by PSW. | Denied, See Lee Aff. par. 11. Question of fact for the jury upon proof and production of documentation by defendants. |
| 44 | PSW does not possess, and has never possessed or utilized, money from H&H's transactions processed by First Data or Eshax, other than monies already remitted. | Denied, M. Conway Aff. par. 3-9. |
| 45 | PSW has not used H&H's money to pursue its lawsuit against First Data *et al.* | Denied, M. Conway Aff. par. 3-9; See, J. Conway Aff. par. 15, and Ex. 11, Amended Complaint verified by Conway par. 20-24. |
| 46 | Lombardi denies doing anything other than trying to get H&H its money. | Denied, See J. Conway Aff par. 12, 15. Question of fact for jury as to whether to believe Lombardi. |
| 47 | PSW filed two federal lawsuits to recover H&H's money. | Admitted to filing; otherwise denied, See, See J. Conway Aff par. 12 |
| 48 | Lombardi has never agreed to be personally bound by the Agreement or entered into an oral agreement with H&H in his personal capacity. | Denied, Lombardi, through his personal assurances and long course of misrepresentation engaged plaintiff's business and patronage while misrepresenting the financial condition of the company and intentionally misrepresenting his intentions to secure plaintiff's funds, as segregated, secure and recoverable. |
| 49 | H&H's damages are limited by paragraph 11 of the Agreement. | Denied. See, Plaintiff's Objection to Defendant's Motion to Strike, memo of law |
| 50 | The AVN Online article about "honesty" was posted in 2002, and it concerns opinion and is not false. | Denied, it confirms a long term pattern of deceit. See, J. Conway Aff. at 11, 12, 15. |

| | | |
|---|---|---|
| 51 | Though unauthorized to do so, on August 8, 2003, Gardner warned all clients that PSW's future stability was not guaranteed and recommended diversification. | Denied, See, J Conway Aff. par. 13; Lee Aff. at 8-9. |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| H&H INTERNET, N.V., a Netherlands corporation | ) |
| Plaintiffs, | ) |
| v. | Civil Action No. 04-324-L |
| P.S.W., a Rhode Island corporation, et al | ) |
| Defendants. | ) |

**INDEX TO ATTACHMENTS AND AFFIDAVITS**

**Attachments**

A. Affidavit of Michael J. Lee

B. Affidavit of Janet E. Conway

C. Affidavit of C. Michael Conway, III

D. Affidavit of Marc LePoutre

**Exhibits**

1. Complaint, PSW v Visa (D.R.I.), face sheet and page 30.

2. Complaint, PSW v Visa (D.R.I.), page 28-29.

3. Complaint, PSW v Visa (D.R.I.), page 31.

4. Spreadsheet of (as Identified by LePoutre and M. Conway).

5. Defendant's Response to First Request for Production

6. R.I. Corporations charter revocation for PSW, Inc.

7. Defendant's Answers to Interrogatories

8. Canas Holdings v PSW (S.D. Fla.) Joint Stipulation, pp 1-5 only.

9. PSW Press Release dated 7-3-03.

10. Defendant's Response to Second Request for Production

11. Plaintiff's Amended Complaint in this action, dated 11-10-04.

12. Plaintiff's Answers to Interrogatories propounded by PSW

13. Plaintiff's Answers to Interrogatories propounded by Lombardi

I, Michael Jason Lee, do hereby declare:

1. I am an attorney of record for Plaintiff H & H Internet, N.V. ("Plaintiff") and the principal attorney for the Law Offices of Michael Jason Lee, APLC. I make this declaration of my own personal knowledge, and could and would testify as to the matters contained herein under oath.

2. Defendant John Lombardi ("Lombardi") and P.S.W., Inc. ("PSW") (collectively referred to as "Defendants") reported in their response to Request for Production No. 18 (Set One) that "there are no 'Annual Reports' for this nonpublic corporation." Attached hereto as Exhibit 5 is a true and correct copy of Defendants' responses to Plaintiff's first set of document production requests, including response number 18. In the same response, Defendants reported that, "All corporate formalities have been followed."

3. PSW has not followed all corporate formalities, let alone the simplest and most routine of corporate formalities, namely timely annual filings. The State of Rhode Island does, in fact, require private corporations – including PSW – to file Annual Reports. Last year PSW had its corporate status revoked for failure to file an Annual Report. Attached hereto as Exhibit 6 is a true and correct copy of a document printed from the website maintained by the Rhode Island Secretary of State, Corporations Division reflecting the same.

4. Plaintiff acknowledges signing a "PSW, Incorporated Wholesaler Credit Card Contract" (the "Agreement") on or about November 9, 2001. To date, PSW has yet to produce a fully executed copy of the Agreement, thereby bringing into question the enforceability of any provision otherwise governing how changes to the Agreement are to be made. (The copy of the contract the Defendants have now produced for the first time as Exhibit A to the Lombardi

affidavit is not signed by Lombardi or PSW, although it appears that certain pages may contain Lombardi's initials.)

5. Further, even if the Agreement were fully executed, its terms and conditions do not prevent it from being changed without the written agreement of both parties. For example, section 18, the very section dealing with contractual modifications, speaks to a situation where the Agreement can be changed without the written consent of both contracting parties.

6. Defendants allege that PSW is only obligated to pay H&H when money is received from the Credit Card Service Company that processed H&H's transaction. Defendants refer to section 6 of the Agreement, which reads: "The Company [PSW] shall pay to the Client, if, as and when received from the **Credit Card Service Company**, the net amount payable by the Company hereunder with respect to such Customer Charges." Setting aside the fact that this provision is highly ambiguous, the question arises: how is Credit Card Service Company being defined? There is no definition is provided in the Agreement itself, which is a remarkable oversight given that payments from PSW to its hundreds of Client on a weekly basis were supposedly contingent upon receipt of monies from an undefined entity.

7. In exploring through alternative means how Defendants choose to define Credit Card Service Company, I learned that Defendants alter their definition based upon the particular argument they are trying to put forward. Attached as Exhibit 7 is a true and correct copy of the discovery responses received from Defendants in response to Plaintiff's first set of interrogatories. Referencing the response to interrogatory number 21, Defendants state, "Plaintiff's money is being wrongfully held by First Data Merchant Services Corporation ($1,600,0000 and Eshax ($210,000). Plaintiff's money will be paid, if and when the money is

actually received from the merchant banks, per the agreement between Plaintiff and PSW." As such, Defendants are evidently defining Credit Card Service Company to mean merchant banks. Attached as Exhibit 8 is a true and correct copy of a "Joint Pretrial Stipulation" filed by Defendants in a case presently pending the United States District Court, Western District of Florida (Case No. 05-10008) where Defendants are defending allegations remarkably similar to those raised in the instant case. Referencing the second sentence in the second paragraph under section B:

> "The contracts also obligate PSW to pay its clients only "if, as and when [payment is] received" from the various credit card companies. In other words, if one of PSW's clients processed credit card charges to "MasterCard," MasterCard would in turn process the charge and remit payment to PSW, who then, in turn, remits the net amount payable to its client. If MasterCard did not remit payment to PSW, PSW was not obligated to – and could not – make payment to its client."

Under this excerpt, Defendants are defining Credit Card Service Company to mean cardmember associations, namely Visa and MasterCard. Merchant banks and card member association are two distinct types of entities and certainly would not be appropriate for grouping under the amorphous subject description "Credit Card Service Company." As ambiguous terms are to be construed against the drafter, the proper interpretation of this provision is a question of fact to be decided upon at trial.

8. Attached as Exhibit 9 is a true and correct copy of a press release issued by PSW on or about July 3, 2003 discussing new regulations being implemented by Visa. Acting as the spokesperson on behalf of the company is none other than Matthew Gardner ("Gardner"), who is identified is an Executive Vice President of PSW. This title is in direct conflict with Defendants' assertion that Gardner was a low-level employee not authorized to speak on behalf of PSW.

9. Defendants claim Gardner's communications were contrary to "company policy," yet they have failed to produce any such written policy to support their already dubious position. Further, when Plaintiff asked for "Any and all DOCUMENTS that evidence Gardner was reprimanded and/or ordered to cease his allegedly unauthorized communications relating to PSW," Defendants' claim that, "the reprimand was oral, there are no responsive documents." Attached hereto as Exhibit 10 is a true and correct copy of Defendants' responses to Plaintiff's second set of document production requests, including response number 29.

10. The August 3 & 6 postings speak for themselves, including the fact that postings, made under from the screen name "PSW Billing Solution" concerns a substantial number of present events.

11. Defendants were asked to produce documents evidencing that Deutsche Bank was withholding monies from eSHAX.com that related to PSW processing. Defendants claimed not to have any responsive documents in its possession, custody or control. See Exhibit 8, response number 17. In fact, Defendants assert that they do not have so much as one piece of paper in their possession that constitutes an agreement, correspondence, processing statement, processing data or financial data between it and eSHAX.com. See Exhibit 8, response number 14. Plaintiff has never been provided with any such documentation. Based on the conspicuous, not to mention highly questionable, absence of any documentation to corroborate its position, Plaintiff denies that Deutsche Bank and/or eSHAX.com are holding $84,523.83 of its money.

I declare that the foregoing is true and correct pursuant to the laws of the United States of America. Executed on February 21, 2006 at Newport Beach, California.

Michael Jason Lee

State of California

County of Orange

Subscribed and sworn to ~~(or affirmed)~~ before me on this 21 day of Febuy ,2006

by Michael JASON Lee

☐ ~~personally known to me or~~ ☒ proved to me on the basis of satisfactory evidence to be the person~~(s)~~ who appeared before me.

Witness ~~my hand and official~~ seal.

Signature Of Notary Public

FARID MANSOUR
COMM. #1526560
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Comm. Expires November 18, 2008

(Seal)

I, Janet E. Conway, do hereby declare:

1. I work for Merchant Risk, Recovery and Intelligence, Inc., which has been retained by Plaintiff H & H Internet, N.V. ("Plaintiff") to investigate and pursue recovery of monies it alleges it is owed by Defendants. I make this declaration of my own personal knowledge, and could and would testify as to the matters contained herein under oath.

2. On or about August 1, 2003, PSW issued to its Clients a "Notice from PSW Billing to Clients RE: Current Updates and Changes" (the "August 1 Notice"). (See Lombardi Aff., Exhibit B.) The August 1 Notice was riddled with inaccurate information. By way of select examples, the August 1 Notice falsely reports that "PSW is healthy and running at full speed." Quite to the contrary, investigations revealed that PSW was experiencing serious problems that threatened the viability of the company and caused it to lose over 85% of its Client base by the very next month. Attached as Exhibit 1 is a true and correct copy of paragraph 137 from the Complaint P.S.W., Inc. ("PSW") filed in the action identified as PSW v. VISA, *et al.*, Case Number 04-347-T-LDA (the "Visa lawsuit"), which is on file with this Court. One primary causal factor was that just three days prior to its upbeat August 1 Notice, PSW lost its ability to process Visa transactions through ECB-E-Commerce Billing and Processing, Ltd. (See Lombardi Aff. at ¶ 7.) Moreover, as of the August 1 Notice, PSW was consistently missing payments to Plaintiff. More specifically, PSW failed to remit six consecutive scheduled payments to Plaintiff covering the processing period of June 27, 2003 through August 7, 2003 (none of which have since been paid). Needless to say, PSW was not running at full speed; perhaps more appropriately, it was screeching to a halt.

3. Excerpting from the last sentence of the first paragraph in the August 1 Notice, PSW states, "Here we wish to be as forthcoming as possible with our status since, as you may know, many circumstances can arise at a moment's notice."

4. Excerpting from the first numbered paragraph in the August 1 Notice, "We want to be clear that the funds exist, will be released, and that we will be working diligently through the course to remit all appropriate funds to you."

5. Referencing the paragraph immediately below the second numbered paragraph in the August 1 Notice, "As always, we will keep you updated if and when any new circumstances arise and apologize for any inconvenience this may cause."

6. Defendant John Lombardi ("Lombardi") asserts that the "PSW Official Statement" released on or about August 6, 2003 (the "August 6 Notice") attached as Exhibit E to his affidavit was "accurate to the best of PSW's then knowledge." His statement is false. PSW and Lombardi (collectively referred to as the "Defendants") knew at the time the August 6 Notice was issued that the self-described "cash flow crunch" was not over. On or about July 24, 2003, First Data Merchant Services Corporation increased its reserve requirement against PSW to $1.7 million and advised Defendants that it would secure the additional reserves by taking 25% of all daily deposits from that day forward until the increased reserve was reached. Attached as Exhibit 2 is a true and correct copy of paragraph 131 from the Complaint PSW filed in the Visa lawsuit.

7. Defendants were fully cognizant that its remaining Clients, one of which was Plaintiff, were closely following their public commentaries. (See LePourte Aff. at ¶ 8.) The September 9, 2003 and November 12, 2003 articles (see Lombardi Aff., Exhibits G & H.),

communications Defendants knew Plaintiff would be reviewing with interest, contained falsities uttered by Lombardi. By way of select example, Lombardi proclaims in the September 9 article, "I will pull no punches. If they [Visa and MasterCard organizations] don't reply in two weeks [to a letter of representation outlining alleged charges], on the morning of the fifteenth day we'll be standing there," meaning ready to file to file a lawsuit in federal court. The Visa and MasterCard organizations ignored the letter, but PSW did not file suit as it aggressively promised. Indeed, rather than filing in two weeks, it did not file until August 16, 2004 – 47 weeks later.

8. The PSW statement released on or about November 27, 2003 (the "November 27 Notice") (see Lombardi Aff., Exhibit J) is also laden with false statements. By way of select example, PSW states, "[A]lthough we have ceased processing, our remaining staff will be continuing to 'fight the fight' for this industry, and to retrieve 100% of your funds." Another portion of the identical notice proclaims, "[W]e continue to fight on the legal front ... and [will] continue to fight for clients' funds for as long as it takes." Quite to the contrary, Defendants have taken the position in this litigation that although PSW is supposedly owed $210,000 by eSHAX.com, and although $84,523.83 of that supposedly belongs to Plaintiff, it made the decision to forego any collection efforts based on Lombardi's supposed "educated understanding" of the eSHAX.com's illiquidity. Plaintiff's requested that Defendants produce the documentation supporting his educated understanding; Defendants state they have no (zero) responsive documents. (See Exhibit 10, response to request 15.) Clearly PSW did not "fight the fight" for "as long as it takes" for Plaintiff or any other Clients owed money by eSHAX.com, as it was evidently content to let these monies go uncollected without any fight whatsoever.

9. By way of additional example illustrating the bogus nature of the November 27, 2003 Notice, Defendants state, "Rest assured that any outstanding payouts due to you are currently 100% intact and have not been fined or assessed in any way." Wrong and misleading. Referencing paragraph 138 of its Complaint in the Visa lawsuit reveals that PSW was assessed an $81,000 fine in September 2003. Exhibit 1 contains a true and correct copy of paragraph 138. In addition, referencing paragraph 142 of the same Complaint, Defendants were informed on or about October 3, 2003 that PSW's combined fee exposure to Visa and MasterCard was $2.2 million. Attached as Exhibit 3 is a true and correct copy of paragraph 142 from the Complaint. Defendants consciously chose to keep this information to themselves. Instead, they chose to go to the other extreme in reassuring its Clients that their monies were safe and sound, despite the fact that is Clients monies were in serious peril. Indeed, Plaintiff is informed and believes that PSW has subsequently been fined approximately $940,000 by MasterCard for serious violations of MasterCard's rules and regulations.

10. Another portion of the November 27, 2003 Notice reads, "We will keep you informed in future e-mails."

11. In light of the foregoing, of particular irony is a quote from Lombardi in an article titled, "PSW Billing: The Straight Dope About Online Processing," which was released on or about September 1, 2002. (See Lombardi Aff., Exhibit P.) Reflecting on himself and PSW, Lombardi observes, "Our biggest difference is honesty. If you have a problem, tell somebody. Don't lie to them." Plaintiff submits that somewhere along the way Lombardi forgot to heed his own advice.

12. Defendants claim that, "PSW filed two federal lawsuits to recover H&H's money," the first lawsuit involving ECB in Florida and the second being the Visa lawsuit. See point 47 of Defendants' "Separate Statement of Undisputed Facts." Lombardi's statements are designedly misleading and without any real substance.

- The first "federal lawsuit" was against ECB and related parties. Because Defendants *claim* Plaintiff had been paid in full for ECB processing by October 1, 2003 (see Perreault Aff. at ¶ 2), a lawsuit filed against ECB on September 30, 2003 was of no assistance "to recover H&H's money." Instead, nearly $1 million was recovered from ECB, yet Defendants have failed to pay one penny of said proceeds to Plaintiff and, through discovery in this matter, steadfastly refused to account for the distribution of these funds.
- The second "federal lawsuit" is an antitrust action filed by PSW and pending in this Court against Visa, MasterCard and First Data Corporation, among other parties. Defendants assert that Plaintiff is owed a grand total of $1,998.33 from First Data Corporation. PSW is seeking $240 million in damages. In no uncertain terms, Defendants are pursuing the lawsuit in hopes of securing a windfall judgment that benefits themselves, not Plaintiff to the tune of less than $2,000.

13. Referring to Exhibit F in the Lombardi affidavit, Matthew Gardner ("Gardner") fell well short of supposedly not guaranteeing PSW's future stability. To the contrary, Gardner states that he and PSW do not expect that PSW will ever cease its processing services.

14. Lombardi opines that, "I am confidant my conduct from the beginning of the relationship until this very day demonstrates a man trying to help his friends continue their business and be paid in full." (See Lombardi Aff. at ¶ 26.) Nevertheless, in the interest of

completeness, it bears noting that my investigations in this case reveal that Lombardi's actions demonstrate an unmistakable objective of frustrating Plaintiff's efforts to collect monies they are owed.

15. I hereby verify the truth of paragraphs 20 through 24 of the plaintiff's Amended Complaint filed with this court dated November 10, 2004, and am the "recovery agent" there identified. I here re-state and incorporate those paragraphs in full and their truth as part of this affidavit.

I declare that the foregoing is true and correct pursuant to the laws of the United States of America. Executed on February 23, 2006 at Blue Bell, Pennsylvania.

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF MONTGOMERY

Janet E. Conway [signature]

Janet E. Conway

Subscribed before me
the February 23, 2006
Rosemarie P. [illegible] [signature]

Notarial Seal
Rosemarie P. [illegible], Notary Public
Buckingham [illegible] County
My Commission [illegible] 2008
Member, Pennsylvania [illegible] Notaries

I, C. Michael Conway, III, do hereby declare:

1. I work for Merchant Risk, Recovery and Intelligence, Inc., which has been retained by Plaintiff H & H Internet, N.V. ("Plaintiff") to investigate and pursue recovery of monies it alleges it is owed by Defendants. I make this declaration of my own personal knowledge, and could and would testify as to the matters contained herein under oath.

2. One of the focal points of my work on this matter has been to analyze the time periods from which Plaintiff is owed monies. As such, one of the necessary components of my work centers on the processors through which certain transactions were processed for which Plaintiff has yet to receive payment. In completing this assignment, I drew upon my background in finance, including four years with a Wall Street securities firm where I specialized in fixed income investment operations involving intensive trade settlement and reconciliation issues.

3. Defendant P.S.W., Inc. ("PSW") and Defendant John Lombardi ("Lombardi) (collectively referred to as "Defendants") allege H & H Internet, N.V. is not owed any money pertaining to what I will term "ECB-processing." As an extension of this, Defendants argue that when the ECB settlement was reached on or about December 15, 2003, Plaintiff was not entitled to any funds received by PSW from the settlement because, "H & H's money from ECB had already been paid." (See Lombardi Aff. at ¶22.) This assertion is incorrect.

4. As reflected by Exhibit 4, Plaintiff has still yet to be paid for processing relating to ECB for the following five time periods:

June 27 – July 3, 2003

July 4 – July 10, 2003

July 11 – July 17, 2003

July 18 – July 24, 2003

July 25 – July 31, 2003

The total owed to Plaintiff for above five time periods, as reflected by the Exhibit 4, is $24,116.66. The majority of this balance emanates from ECB processing, whereas the balance relates to what I will term First Data-processing. [This balance does not include a substantial sum of additional monies that are owed that were originally withheld by PSW as reserve funds. However, in the interest of simplicity, I will limit my analysis herein to unpaid processing funds since it serves the purpose of clearly undercutting any notion that Plaintiff had been paid all the monies it was due from ECB-processing.] To date, Defendants have not paid Plaintiff any portion of the $24,116.66 balance.

5. Plaintiff is still owed money from ECB-processing, yet it did not receive any distributions from the ECB settlement. As such, Plaintiff is reasonably entitled to an accounting of the nearly $1 million in settlement funds PSW received from ECB in order to understand how the funds have been allocated.

6. Lombardi states, "It was only in or around late January 2004 that PSW's accountant explained to me that all of H&H's Visa transactions pertaining to ECB had already been paid." (See Lombardi Aff. at ¶21) If Lombardi supposedly first learned of the discrepancy in late January 2004, it fails to explain why Plaintiff did not receive any remittances from mid-December 2003 to late-January 2004, as Lombardi promised Plaintiff monies upon receipt from ECB and it is Plaintiff's understanding that at least two large settlement payments were received by PSW during this interim period. See LePoutre Aff. at ¶ 4-5.

7. The "Affidavit of Michael G. Perreault, CPA" ("Perreault") attached to Defendants moving papers is of limited value and misleading in any event.

(a) Perreault draws conclusions from "three spreadsheets attached to John Lombardi's affidavit as Exhibit O." He conspicuously does not state that he participated in the creation of the subject documents, so we must assume they were assembled by an unidentified third party(ies) without his assistance.

(b) Perreault further fails to state that he has personally verified any of the information contained in the documents. Indeed, it is clear he cannot make this representation given an obvious lack of fact checking relating to the simplest of items on which he relies. By way of example, Perreault uses a processing fee as 13.5% of gross, despite Plaintiff being charged a 12.5% processing fee as clearly set forth in the parties' processing agreement, which was the identical rate in place throughout the entirety of the parties' relationship.

(c) Perreault's "accounting method," not coincidentally, makes no effort to match payments to time periods. Instead, in a transparent effort to illustrate that Plaintiff has been paid in full from ECB-processing, Perreault applies payments that Plaintiff received from PSW relating to processing through eSHAX.com against monies Plaintiff is owed from ECB-processing. The practical effect, of course, is designed to (a) put Defendants in a position of arguing that it was justified in not paying Plaintiff any monies from the ECB settlement and (b) side-step the requirement of documenting where the settlement funds received in satisfaction of the ECB litigation were remitted after receipt.

8. Lombardi's affidavit offers no additional insights into who assembled the spreadsheets upon which Perreault based his analysis, let alone how they were assembled. Instead, Lombardi merely states, "True and correct copies of these spreadsheets accurately

setting forth H&H Internet's processing and payout history with PSW, Inc. are attached hereto as **Exhibit O**." (See Lombardi Aff. at ¶ 29.)

9. The fallacy of Defendants' "accounting method" is revealed by matching payments made against monies owed from standard weekly intervals. For example, referencing the time periods (1) August 8-August 14, 2003, (2) August 15-August 21, 2003 and (3) August 22-August 28, 2003, payments were made in the amounts of (1) $1,052.48, (2) $5,468.66 and (3) $7,601.75, respectively. Note that each of the payments match to the penny the amounts that were owed for the corresponding time period. Further note that Plaintiff's transactions were no longer being processed through ECB as of August 8, 2003, meaning the payments relating to the entire time period of August 8-August 28 were necessarily attributable to another processor. Nevertheless, Perreault incorrectly applies each of the afore-noted payments against monies owed to Plaintiff for ECB-processing in an effort to drive down the ECB-related balance.

10. Based on my review and analysis, PSW failed to pay monies owing to Plaintiff from the ECB settlement despite clearly owing monies to Plaintiff from ECB-processing. Further, PSW continues to owe Plaintiff monies from First Data-processing. In sum, Plaintiff is owed monies from processing through ECB, First Data and eSHAX.com.

11. Judging from what Plaintiff asserts are Defendants' contrived accountings, in tandem with Defendants resolute refusal to account for funds it received in the ECB settlement, Plaintiff asserts that Defendants have spent its money in an unauthorized manner, including the pursuit of the Visa lawsuit.

I declare that the foregoing is true and correct pursuant to the laws of the United States of America. Executed on February 21, 2006 at Blue Bell, Pennsylvania.

C. Michael Conway, III

Before me this 21st day of Feb 2006 appeared C. Michael Conway, III

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
CHARL[illegible] CA[illegible]RO, Notary Public
Whitem[illegible] Montgomery County
My Comm[illegible]s August 4, 2008

I, Marc LePoutre, do hereby declare:

1. I am the former financial manager for Plaintiff H & H Internet, N.V. ("Plaintiff"). I make this declaration of my own personal knowledge, and could and would testify as to the matters contained herein under oath.

2. The spreadsheet attached as Exhibit 4 to the Affidavit of C. Michael Conway is a true and accurate copy of the actual spreadsheet Plaintiff maintained to track data, much of which was taken from information maintained in a password protected area on PSW's website, relating to its processing activities with P.S.W., Inc. ("PSW"). The document was assembled and maintained by Plaintiff in the normal course of business.

3. I had several conversations with Defendant John Lombardi ("Lombardi") of PSW (Lombardi and PSW are collectively referred to as "Defendants") from August 2003 through December 2003. Because PSW began repeatedly missing scheduled payments in early August 2003, I began asking Lombardi questions about PSW's financial situation in mid-August 2003. On at least two occasions I asked him about the manner in which PSW was holding Plaintiff's reserve funds on its behalf. Lombardi specifically advised me that Plaintiff's reserve funds were not being co-mingled with other company monies. To the contrary, he made a point of reassuring me that PSW's acquiring bank and/or its processing agent held sub-accounts for each PSW merchant that had reserve funds withheld from their merchant processing transactions.

4. I spoke with Lombardi on at least three separate occasions from October 2003 to December 2003 about the lawsuit PSW filed against ECB Processing and related parties in a federal court in Florida. I have since learned it was a case once pending in the United States District Court, Western District of Florida captioned PSW, Inc. v. ECB Processing, *et al.* ("ECB

litigation"). Lombardi repeatedly assured me that Plaintiff would be receiving a substantial payment once the ECB litigation was resolved and PSW received its settlement payments, several times suggesting that payment would be around six figures. He repeatedly promised to keep me apprised of settlement developments and timetables for receiving settlement funds.

5. On December 9, 2003, Lombardi advised me that the ECB litigation had been settled and he had yet to receive a payment but was expecting a wire to hit his attorney's trust account within the week for $500,000, said monies constituting a partial payment of settlement monies due. He explicitly stated that Plaintiff would receive a substantial payment once the funds were received. However, Lombardi did not follow through on his promise, as he failed to report receipt of any settlement funds, which is especially notable since I am informed and believe that PSW received at least two separate payments that totaled nearly $1 million.

6. Plaintiff did not "immediately" agree to transfer its processing to eSHAX.com. It only did so after Lombardi contacted Plaintiff and, through several discussions, advised Plaintiff of the immediate and seamless processing eSHAX.com could offer. Lombardi further assured Plaintiff that he would monitor the relationship to better ensure everything went smoothly.

7. Plaintiff monitored PSW's posting on the bulletin boards maintained on the GFY website. Plaintiff relied on Defendants' representations to better gauge the health and viability of PSW, namely the reliability of its processing services, its commitment to continue processing despite processing obstacles created through new processing regulations and its commitment to recovering funds allegedly withheld by third parties. It was these very representations that caused Plaintiff to continue processing with PSW, which it would not have done had it correctly been correctly advised of the actual risks of continuing to process with PSW.

8. Lombardi was well aware that Plaintiff and other Clients of PSW closely monitored the information PSW was publicly disseminating, including information posted on the GFY bulletin board by PSW. In fact, I had a conversation with Lombardi about this precise issue in early August 2003. He explicitly acknowledged awareness of the postings on GFY in early August 2003, meaning he had knowledge of postings well before August 26, 2003, his claimed date of first knowledge.

9. The representations Lombardi made to me in his e-mails to my attention dated November 13 and 16, 2003 are patently false.

(a) By way of select example, Lombardi states in his November 13, 2003 e-mail, "[Y]ou will be the first to hear when a wire comes. I will take care of you." As detailed in paragraph 4 (above), Plaintiff was never contacted regarding the receipt of any wires whatsoever.

(b) By way of select example, Lombardi states in his November 16, 2003 e-mail, "I haven't seen a wire ... One thing I do know is you will lose no money with us." I am informed and believe that PSW still has yet to satisfy a balance owed to Plaintiff that I recall was approximately $142,000 as of the date I left my position as financial manager for Plaintiff.

10. The two e-mails from Lombardi set forth in Exhibit L to his affidavit illustrate the standard protocol: sidestep providing clear and accurate information and make promises regarding his intention to make Plaintiff whole. Regardless of whether or not Defendants and Plaintiff were in an "adversarial posture," Plaintiff still expected Lombardi to be truthful and true to his word.

I declare that the foregoing is true and correct pursuant to the laws of the United States of America. Executed on February 16, 2006 at London, England.

Marc LePoutre